**E-FILED**
Thursday, 23 January, 2014  04:11:33 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JOAN A. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 09-3335 |
| | ) | |
| ILLINOIS DEPARTMENT OF | ) | |
| REVENUE, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

RICHARD MILLS, U.S. District Judge:

This matter is before the Court on the Defendant's Motion for

Summary Judgment.

I. INTRODUCTION

Plaintiff Joan A. Williams, an African-American, has asserted pro se

claims for hostile work environment racial discrimination and retaliation

pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"). This

activity is alleged to have occurred during the Plaintiff's employment at

Defendant Illinois Department of Revenue ("the Defendant" or "the

Department"). Williams is employed as a Revenue Tax Specialist III in the

Commerce Commission Division.

The Defendant contends it is entitled to summary judgment on all claims, asserting that she is unable to establish a prima facie case of hostile work environment because she has produced no evidence for employer liability.  It alleges the Plaintiff has not established a prima facie case of retaliation because she did not suffer an adverse employment action that was causally related to a protected activity.  Moreover, the Plaintiff has not produced any evidence tending to show that similarly situated individuals that did not engage in protected activity were treated more favorably than the Plaintiff.

## II. FACTS[1]

### A. Background and allegations of discrimination

As a Revenue Tax Specialist III in the Commerce Commission

---

[1] These facts are taken primarily from the Defendant's Statement of Undisputed Material Facts in its Memorandum in Support of its Motion for Summary Judgment.  Because the Plaintiff has failed to respond, the Court will take all properly supported allegations as true.  Although the Plaintiff did not file a Statement of Additional Material Facts, given her pro se status, the Court will consider any properly supported facts she has submitted in opposition to the Defendant's Motion.

Division, the Plaintiff is responsible for Electronic Funds Transfers. Previously, Williams was assigned as a Revenue Tax Specialist III to the Local Tax Division from September 2003 through August 2007.  In the Local Tax Division, the Plaintiff was responsible for allocating tax revenues to municipalities in the local government.

Rebecca "Becky" Brown was the Plaintiff's immediate supervisor in the Local Tax Division.  The Plaintiff alleged that she was subjected to racial discrimination by her supervisor since 2003, having the slurs "nigger please" and "you niggers" yelled at her.  Williams claims that she complained regularly to her supervisor about the use of the slurs to no avail.  Moreover, she alleges that although she complained to her EEO Officer about the discriminatory behavior of her supervisor, the slurs continued.

The Plaintiff alleges she complained about the use of the phrase "nigger please" to the Department's Internal Security, the EEOC, the Illinois Department of Human Rights and the Office of the Executive Inspector General.  On February 2, 2007, the Internal Investigations

3

Division of the Department compiled a list of complaints and investigations that involved the Plaintiff, either as a complainant or as a subject. Internal security has no record of Williams making a complaint regarding the use of racial slurs.

On May 26, 2006, the Plaintiff sent the Department an employment discrimination complaint. In that complaint, the Plaintiff stated that the date of the alleged discriminatory practice was "Continuous/5-25-06;" the basis of the alleged discriminatory practice was race, color, sex, and age; and the people discriminating against Plaintiff were identified as Gloria Crook and Mary DeCroix. Williams stated that the facts of the alleged discrimination are:

> I came in without training, and was exspected [sic] to do the work with little or no training. Also everything I do he says isn't correct and my answeres [sic] are the same as the white girls. He told me when I come in that his father had a problem with black people and that he try not to be like that. Cecil Denton has and does attack me everytime [sic] I in the present [sic] of another black person. He has made a statements [sic], such as that none of the black employees in the Dept Of Revenue know their jobs.

> Ruby Taylor, the Department's Equal Employment Opportunity

4

Officer, interviewed Williams as part of the investigation into her May 26, 2006 complaint.  During that interview, the Plaintiff claimed that employees in her unit routinely used racial slurs.  On May 31, 2006, Taylor informed the Plaintiff that she could pursue her EEO complaint with the Department of Human Rights or with the EEOC.

On August 16, 2006, the union interviewed Becky Brown regarding the Plaintiff's complaint about racial slurs.  At the time, Brown admitted that she used the phrase "nigger please" with Williams for 15 years back and forth.  As the result, the union filed a written grievance on the Plaintiff's behalf.  Although she testified that she thought she filed a grievance regarding racial slurs before then, the Plaintiff did not file a grievance regarding the use of racial slurs prior to August 16, 2006.

On August 18, 2006, as a result of Brown's admitted use of the phrase "nigger please," Cecil Denton sent an email to every employee in the Local Tax Division with the Department's policy regarding harassment and discrimination.  Denton also sent a memo stating that no one should be subject to racial slurs.  He cautioned employees to treat everyone with

respect and honor.

Becky Brown received a one-day suspension and Cecil Denton told Brown that she was not to use that language any longer.  The Plaintiff was also offered a transfer to a position where she would not be supervised by Becky Brown.  However, Williams did not want to transfer because she did not know the work and the hours were not convenient.  Had she accepted the transfer, the Plaintiff would have had the same title and pay as she had in the Local Tax Division.

The Plaintiff claims that Becky Brown used a racial slur one time after Brown was disciplined.  This happened around the time the Plaintiff spoke with the Office of the Executive Inspector General or when she filed with the EEOC.

On January 19, 2007, the Plaintiff filed a charge of discrimination, alleging that:

> My employment began with Respondent in or around October 1974.  My most recent position is Revenue Tax Specialist III. I have been subjected to racial discrimination by my supervisor since in or around 2003, with the racial slurs "nigger please" and " you niggers."  I complained repeatedly to my supervisor about the use of the slurs to no avail.

6

On or about June 27, 2006, I complained to the EEO Officer about the discriminatory behavior of my supervisor, but the slurs continued.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

In that charge, the Plaintiff stated that the earliest date of discrimination took place on March 1, 2006 and the latest discrimination took place January 10, 2007.  In her January 2007 charge of discrimination, the Plaintiff complained about Becky Brown's one additional use of a racial slur after Brown was disciplined in 2006.  The phrase "nigger please" was not used after January 2007.

On September 7, 2007, the Plaintiff filed a charge of discrimination, claiming that she has been subjected to harassment and unequal terms and conditions of employment since she filed her charge of discrimination on January 19, 2007.  The Plaintiff thinks that Cecil Denton was mad at her for complaining about the use of racial slurs because Denton was always angry if anyone, including Caucasian Revenue Tax Specialist IIIs, went over his head.  Denton never said he was mad at the Plaintiff for complaining

7

about the use of racial slurs.

The Plaintiff thinks Denton, Becky Brown and Virginia Barletti were mad at the Plaintiff for complaining about the use of racial slurs because they were scrutinizing her work, would not talk to Williams when they saw her, and Barletti once asked to take a picture of Williams to see how her camera takes black and white pictures.  Barletti did not work with the Plaintiff in the Local Tax Division.  The Plaintiff felt Barletti was mad at her when Barletti asked to take Williams's picture because of the tone Barletti used, her body language, and the way she acted.  Williams thinks that Barletti singled Williams out to test her camera in order to retaliate against her for complaining about the use of racial slurs because they were not in the same unit.  Barletti was friends with Becky Brown and Barletti was one of the people Williams overheard saying they were going to try to make "her" life hell.  The Plaintiff has no other evidence that Barletti's request to test out her camera was retaliation for complaining about racial slurs.

On October 10, 2006, the Plaintiff filed a grievance complaining that

8

on Friday, October 6, 2006 at 12:35 p.m., she heard a conversation between Becky Brown, Cecil Denton and Virginia Barletti. Williams stated in the grievance that the three were discussing how they were going to "torture someone and make their life miserable." The Plaintiff claimed that Barletti stood up, motioned towards the Plaintiff, and said "[s]hit, there she is."

The Department immediately investigated the Plaintiff's allegations. Michael Klemens interviewed Cecil Denton and Virginia Barletti, separately, less than two hours after receiving the Plaintiff's complaint. Both Denton and Barletti denied saying they were going to torture someone. Denton stated that they may have talked about making their own lives miserable. Barletti stated that she did not see Williams on October 6, 2006. The grievance was resolved with a statement that all Department employees will refrain from creating a hostile work environment.

B. Increased scrutiny and evaluations

The Plaintiff claims that her work was scrutinized by Cecil Denton,

9

Becky Brown, Dave Stewart, Diane Watson, and Terri Looker after the Plaintiff complained to Ruby Taylor in 2006. Brown documented everything the Plaintiff said or did, sent emails, and never again talked to Williams in a cordial manner. Denton had the Plaintiff's work in his office for two or maybe three years. By scrutinized, the Plaintiff means they would find fault in all of her work--they would want to change a letter that Williams had written, would put red marks all over it and tell Williams to change the letter. The only evidence the Plaintiff has that Dave Stewart started scrutinizing her work because she complained about racial slurs is that he started scrutinizing her work after her complaint, he stopped talking to the Plaintiff, and found, after reviewing the Plaintiff's time off, that she took a day off that she was not entitled to take. Williams believed Diane Watson was scrutinizing her work because Watson believed that Williams was committing grave errors when she allocated $20,000 in tax revenues to the wrong municipality. Watson was not a supervisor of Williams. Williams was in a higher position. Cecil Denton scrutinized the Plaintiff's work by keeping her work in his office and saying she did not meet time

frames.  He would return everyone else's work.

In her performance evaluation, the Plaintiff received "meets expectations" in each category in every evaluation for the periods of September 1, 2003, through July 31, 2009.

Williams did not identify any similarly situated individuals that had their work returned in a timely manner from Cecil Denton.  The Plaintiff believes that Denton kept her work in his office as a result of her complaint about racial slurs because it occurred after her complaint, he did not treat the Caucasian women the same, he made statements about Archie Bunker, and would say that he was raised in a racist home.

Although the Plaintiff claims she was treated differently than Gloria Crook, Mary DeCroix, Terri Looker, Diane Watson and Eric Glaumb from June 2006 until she left the unit, the Plaintiff does not say how she was treated differently.

Williams claims Terri Looker scrutinized her work by going into Cecil Denton's office and returning the work that Denton had been holding for two years.  Looker gave the Plaintiff her work back after Denton left the

11

Department.  According to the Plaintiff, anything Looker would have done would have discriminated against the Plaintiff because "she was part of it." Williams believes Looker gave Williams her work back from Denton because Williams complained about racial slurs, because Looker was "part of the plot," that all of the supervisors work together to cover it up if one of them gets into trouble.  The only evidence the Plaintiff has that Looker was part of the plot is her own personal feelings.

The Plaintiff alleges employees would police and stalk her by coming, standing, and stopping at her door.  Williams believes she was policed and stalked in retaliation for her complaints about racial slurs because this did not happen before she complained.  Williams claims she was policed and stalked on one day: April 27, 2007.

The Plaintiff testified it is hard for her to be in the presence of Caucasians because she thinks they are going to discriminate against her or treat her with indifference.

C. Plaintiff's medical condition

The Plaintiff alleges that she suffers from high blood pressure and

12

panic disorder as a result of the stressful work environment she endured. In March 2003, the Plaintiff was diagnosed with Post-Traumatic Stress Disorder (PTSD) and Depression by Kay Gottrich, a licensed clinical professional counselor. Gottrich determined that Williams suffered from PTSD due to circumstances unrelated to the workplace. However, Gottrich believed that Plaintiff's workplace environment caused her PTSD to be reactivated and worsened.

David Sandercock, M.D., was the Plaintiff's physician. Dr. Sandercock saw Williams on June 30, 2006. Dr. Sandercock noted that Plaintiff's brother was killed three weeks prior to the appointment and that Williams was finding it hard to concentrate, mood down, tearful, energy down, not sleeping. Dr. Sandercock also noted that Plaintiff had chest pain when stressed.

On June 30, 2006, Williams was diagnosed with acute depression, which Dr. Sandercock attributed to the death of her brother.

Williams had also been diagnosed with hypertension on December 20, 2005. Dr. Sandercock noted that Plaintiff had elevated blood pressure,

was not watching her diet and was on caffeine. Dr. Sandercock noted that Plaintiff was fatigued and that she had three kids. Dr. Sandercock could not say definitely that Plaintiff was stressed at the time she was diagnosed with hypertension. Moreover, Dr. Sandercock could not say, with a reasonable degree of medical certainty, what caused the Plaintiff's mental or emotional problems.

### D. Department policy and Becky Brown's authority

Typically, the Plaintiff received an employee handbook once a year and she has reviewed the section in the handbook pertaining to harassment. Williams received yearly training from the EEOC regarding harassment. The Department's policy prohibiting harassment and discrimination stated that each senior staff member, manager and supervisor was responsible for providing a work environment free from discrimination. Additionally, the Department had an anti-harassment policy in the employee handbook. That policy lists a phone number for the EEOC so that employees are able to report discriminatory acts.

14

Becky Brown was a supervisor in the Local Tax Division.  As a supervisor, Brown had the authority to assign work to employees assigned to the Local Tax Division.  She also had authority to review the work of those same employees.  Brown had the authority to approve or deny an employee's request to use benefit time.  As a supervisor in the Local Tax Division, however, Brown did not have the authority to hire, fire, demote, transfer or discipline employees.

## III. DISCUSSION

<u>A. Legal standard</u>

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  The Court construes all inferences in favor of the Plaintiff.  See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).

15

Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor. See id.

### B. Hostile work environment

The Plaintiff has asserted a hostile work environment claim based on race. It is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "Title VII protects not just tangible employment actions but also evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." Hall v. City of Chicago, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotations and citation omitted).

To establish a prima facie case of hostile work environment based on

race, a plaintiff must offer evidence that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [race]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." Porter v. City of Chicago, 700 F.3d 944, 955 (7th Cir. 2012) (internal quotation marks and citation omitted). In most cases, it is a combination of severity and frequency that constitutes actionable harassment. See Patton v. Keystone RV Co., 455 F.3d 812, 816 (7th Cir. 2006). However a single act, if sufficiently severe, can create a hostile work environment. See Berry v. Chicago Transit Authority, 618 F.3d 688, 692 (7th Cir. 2010).

The Plaintiff claims that from 2003 to 2007, her supervisor, Becky Brown, used the racial slurs "nigger please" and "nigger." When the facts are construed in a light most favorable to Williams, the Court concludes she has produced sufficient evidence to establish the first three elements of a hostile work environment claim.

In order to establish a hostile work environment claim, Williams "must show a basis for employer liability by proving either (1) that a

17

supervisor participated in the harassment that created the hostile work environment or (2) that [the employer] was negligent in discovering or remedying harassment by [her] co-workers."  Montgomery v. American Airlines, Inc., 626 F.3d 382, 390 (7th Cir. 2010).

The Plaintiff was harassed by Becky Brown.  Although Brown is the Plaintiff's supervisor, the Court concludes that she is not the Plaintiff's supervisor as that term is used in the context of a Title VII claim. "'Supervisor' is a term of art that denotes more than an individual with a higher rank, a superior title, or some oversight duties."  Montgomery, 626 F.3d at 390.  For purposes of Title VII, a supervisor is a "person with the power to directly affect the terms and conditions of the plaintiff's employment."  Andonissamy v. Hewlett-Packard Co., 547 F.3d 841, 848 (7th Cir. 2008).  Generally, this means the "authority to hire, fire, promote, demote, discipline or transfer" the employee.  See Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 506 (7th Cir. 2004).  Even "the combination of directing or managing a plaintiff's activities, providing evaluation input to a plaintiff's supervisor, and training a plaintiff" are not necessarily enough

18

to mean that an employee qualifies as a "supervisor." Montgomery, 626 F.3d at 390.

The undisputed facts demonstrate that Becky Brown was not a "supervisor" for purposes of Title VII. Brown had the authority to assign and review work. Moreover, she had the authority to approve or deny an employee's request to use benefit time. However, Brown did not have the authority to hire, fire, demote, transfer, or discipline employees. The Court concludes that, because Brown did not have the ability to affect the terms and conditions of the Plaintiff's employment, Brown does not qualify as a supervisor under Title VII.

Because Becky Brown does not qualify as a supervisor, Williams must present evidence that the Department was "negligent in discovering or remedying harassment by [her] co-workers." Montgomery, 626 F.3d at 390. She must present evidence that Defendant "failed to have and enforce a reasonable policy for presenting harassment." Id. at 391 (citation omitted). The showing requires the Plaintiff to demonstrate that she "made a concerted effort to inform [the Department] of the racial harassment

[s]he was allegedly experiencing or that the harassment was sufficiently obvious to put [the Department] on constructive notice."  Id.

The Plaintiff has not pointed to evidence tending to show that she made a concerted effort to inform the Defendant of the racial slurs. Williams has not presented evidence that the department had constructive notice of the harassment.  The record establishes that the Department had a policy prohibiting harassment.  Williams received a copy of the handbook each year.  The policy provided that each senior staff member, manager, and supervisor was responsible for providing a work environment free from discrimination.  The Plaintiff could have reported the harassment to any senior staff member, manager, or supervisor.  Williams could have called the EEO Office to report her complaint or she could have filed a grievance at any time regarding the use of racial slurs.  The Plaintiff did not say that she was subjected to racial slurs until EEO Officer Ruby Taylor interviewed Williams in response to her May 26, 2006 complaint to the Department of discrimination.  On August 15, 2006, the union filed a grievance regarding Brown's admitted use of the racial slur "nigger please."  In order for there

to be a basis for employer liability, the employer must be apprised of the discrimination.

In this case, the Defendant acted quickly when it learned of the discrimination.  The record shows that soon after Williams complained about the use of racial slurs, Becky Brown admitted to having used the phrase "nigger please" for years.  The Department disciplined Brown with a one-day suspension and admonished her to never use that language again.  Additionally, Cecil Denton emailed the Department's harassment policy to everyone in the Local Tax Division and sent a memo stating that no one should be subject to racial slurs and cautioned everyone to treat others with respect and honor.  Williams was also given the option of transferring to a different division where she would not be supervised by Brown.  Additionally, the Plaintiff would have had the same title and pay if she had accepted the transfer.  She declined the transfer.  The Plaintiff alleged that Brown used a racial slur one more time, around January 2007, but has not done so since then.

Based on all of the evidence in the record, the Court concludes that

21

the Department took prompt and appropriate corrective action after learning of the Plaintiff's complaint.   Accordingly, Williams cannot establish that Defendant is liable for a hostile work environment.   The Defendant is entitled to summary judgment on that claim.[2]

C. Retaliation

Title VII prohibits an employer from taking an adverse employment action against an employee because she filed an employment discrimination charge.   See 42 U.S.C. § 2000e-3(a); Silverman v. Board of Educ. of City of Chicago, 637 F.3d 729, 740 (7th Cir. 2011).

(1)

A plaintiff can proceed under the direct method or indirect method

---

[2]To the extent that Plaintiff contends her physical and/or emotional problems were based on a hostile work environment, the Plaintiff presented no admissible evidence tending to show that her medical problems such as depression or hypertension were caused or exacerbated by the hostile work environment.  The Court further notes that although the Plaintiff alleges Kay Gottrich diagnosed her with PTSD, a licensed clinical professional counselor is not competent to render a medical diagnosis such as PTSD.  See Rademaker v. Blair, No. 10-3332, 2010 WL 5376263, at *3 (C.D. Ill. Dec. 22, 2010). Although Dr. Sandercock mentions "stress related to her job" and "work related problems," the Plaintiff has pointed to no evidence wherein Dr. Sandercock attributed any of the Plaintiff's medical problems to a hostile work environment.

in attempting to establish retaliation.  See Majors v. General Elec. Co., 714 F.3d 527, 537 (7th Cir. 2013).  "The direct method requires proof that (1) the employee engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the two." Id.  "The indirect method requires proof that (1) the employee engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity."  Id.

The Plaintiff has shown that she engaged in statutorily protected activity by filing a charge of discrimination on January 19, 2007.  However, Williams has not shown that she suffered an adverse employment action, which is a required element under both methods.

Williams was not discharged or demoted and she did not receive an undesirable reassignment.  The Plaintiff claimed that her work was scrutinized more carefully after filing an internal complaint, meaning that "they" would want to find fault with everything, would want to change a

23

letter the Plaintiff wrote, and would put red marks on the Plaintiff's letters. Additionally, Williams claimed to overhear a comment that Cecil Denton and Virginia Barletti were going to "torture someone and make their life miserable," which she understood to mean they intended to make the Plaintiff's life miserable.[3]   Additionally, Williams claimed that Denton, Barletti and Brown would not talk to Williams because they were mad at her.  The Plaintiff further claimed that she was policed and stalked on April 27, 2007.  She further stated that any action taken by Terri Looker would have been discriminatory.

The Plaintiff's retaliation claims also fail under the direct method because she has produced no evidence showing that any alleged adverse action is causally related to a statutorily protected activity.  The record establishes that Plaintiff first engaged in a statutorily protected activity on January 19, 2007, by filing her EEOC charge.  Even assuming some of her allegations constituted adverse actions, some of these occurrences predated

---

[3]The record establishes that Plaintiff filed a grievance regarding this statement and the grievance was resolved with a statement that all Department employees would refrain from creating a hostile work environment.

24

her statutorily protected activity.  The claim that Virginia Barletti and Cecil Denton were going to "torture someone and make their life miserable" occurred on October 6, 2006.  The increased scrutiny of the Plaintiff's work by several employees is alleged to have occurred in 2006 after she complained to Ruby Taylor.   The Plaintiff's internal complaint of discrimination does not constitute protected activity under Title VII.  See Hatmaker v. Memorial Medical Center, 619 F.3d 741, 747 (7th Cir. 2010) ("To bring an internal investigation within the scope of the clause we would have to rewrite the statute.").

To the extent Williams claims several people stopped talking to her after she filed her complaint, the Court concludes that this does not rise to the level of an adverse employment action.  See Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 741 (7th Cir. 2011) (observing that Title VII is not a general civility code).

The Plaintiff alleges one retaliatory action that occurred after she filed a charge of discrimination with the EEOC.  She alleges she was policed and stalked on April 27, 2007.  People would come to her door and stop there.

25

However, it does not constitute an actionable harm to be stared and yelled at.   See Stephens v. Erickson, 569 F.3d 779, 790 (7th Cir. 2009). Accordingly, the Court concludes that the acts described Williams do not constitute actionable harms.  The Plaintiff is unable to establish a prima facie case using the direct method.

(2)

The Court further concludes that, even if the Plaintiff could establish that she suffered an adverse employment action, she is unable to show that she was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity.  Williams alleges that since June 2006, she was treated differently than Gloria Crook, Mary DeCroix, Terri Looker, Diane Watson and Eric Galumb. Because this alleged different treatment began several months before her protected activity, the Plaintiff is unable to demonstrate that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Accordingly, the Court concludes that Plaintiff is unable to establish a prima facie case of retaliation using the indirect method

Because the Plaintiff has not established a prima facie case under either the direct or the indirect method, the Defendant is entitled to summary judgment on the retaliation claims.

## IV. CONCLUSION

Although the racial slurs and comments made by the Plaintiff's co-workers were completely reprehensible and constituted entirely inappropriate workplace conduct, the Court concludes that Defendant is entitled to summary judgment on the hostile work environment claims because the Defendant took prompt corrective action.  Moreover, the Plaintiff is unable to establish a prima facie case of retaliation under either the direct or indirect method because she did not suffer an adverse employment action.  Even if there was an adverse action, Williams did not establish a causal relationship between the adverse action and her protected activity.  The Plaintiff also has not shown that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

Ergo, the Defendant's Motion for Summary Judgment [d/e 49] is

ALLOWED.

Judgment shall be entered in favor of the Defendant and against the

Plaintiff.

This case is terminated.

ENTER: January 23, 2014

FOR THE COURT:

s/Richard Mills
Richard Mills
United States District Judge